# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Aaron L.*, 2013 IL App (1st) 122808

---

| | |
|---|---|
| Appellate Court Caption | *In re* AARON L., a Minor, (The People of the State of Illinois, Petitioner-Appellee, v. Aaron L., a Minor, Respondent-Appellant). |
| District & No. | First District, First Division<br>Docket No. 1-12-2808 |
| Filed | March 29, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The termination of respondent's wardship, the discharge of the Department of Children and Family Services as guardian and the closure of his child protection case was reversed and cause was remanded for an extension of the wardship and guardianship until respondent's twenty-first birthday or such time that he is able to live independently. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 94-JA-01838; the Hon. Marilyn F. Johnson, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on Appeal

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Jean M. Agathen, of counsel), guardian *ad litem*.

No brief filed for appellee.

Panel

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.

Justices Rochford and Delort concurred in the judgment and opinion.

## OPINION

¶ 1    This appeal arises from the September 27, 2012 order entered by the circuit court of Cook County, which terminated the wardship and guardianship of the respondent-appellant, Aaron L. (Aaron), a minor, and closed his child protection case. On appeal, the Cook County public guardian (public guardian), on behalf of Aaron, argues that: (1) the circuit court failed to comply with section 2-31(2) of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/2-31(2) (West 2010)) when it terminated Aaron's wardship, discharged the Department of Children and Family Services's (DCFS) guardianship of Aaron and closed the case; and (2) the manifest weight of the evidence presented to the circuit court established good cause to extend Aaron's wardship and guardianship. For the following reasons, we reverse the judgment of the circuit court of Cook County and remand the case for further proceedings.

¶ 2                                    BACKGROUND

¶ 3    On May 12, 1993, Aaron was born. In 1994, by age one, the juvenile court found Aaron to be neglected, adjudged him a ward of the court, and placed him in the guardianship of DCFS. During Aaron's childhood, he was placed in foster homes, and the court made several findings over time that DCFS had failed to make reasonable efforts to achieve Aaron's permanency goals–including failing to file a petition to terminate the parental rights of Aaron's parents. In 1999, the court appointed Aaron's paternal great-grandmother, Hattie D. (Hattie), as his guardian, with whom he lived for several years until the court vacated Hattie's guardianship in 2006. Thereafter, Aaron again became a ward of the court, was placed in the guardianship of DCFS, and lived in foster homes. In 2006, Aaron's mother abducted Aaron and one of his siblings, Tonette, and took them to her residence in Wisconsin. After about a month, however, the mother returned her children to Chicago on a Greyhound bus, after which Aaron lived in several foster homes. In March 2007, Aaron, at age 13, was referred by his caseworker to undergo a psychological evaluation as a result of Aaron's severe defiant behavior in two foster homes. The psychological report stated that in February 2007, Aaron was criminally charged with committing sexually abusive behavior

with another minor[1]; that he had a "borderline mentally deficient range of cognitive ability," with an IQ score of 72; and that Aaron suffered from "significant difficulties in his emotional and social functioning." The psychological report recommended that Aaron be placed in a residential therapeutic group home; that he undergo psychiatric consultation to determine his need for psychotropic medication; and that he be required to participate in individual and group therapy. Subsequently, Aaron was placed in a DCFS-approved residential treatment center in Kankakee, Illinois, during which he continued to serve his five-year probation for aggravated battery and was reported to have been prescribed the psychotropic medication, Risperdal.

¶ 4       In July 2010, 17-year-old Aaron was placed in the ChildServ group home in Lisle, Illinois. In October 2011, Aaron was placed in ChildServ's Transitional Living Program (TLP) in Wheaton, Illinois. TLP was a supervised, but less restrictive, living arrangement which prepared youths for independence by offering them support and services. In a December 2011 service plan prepared by DCFS (the December 2011 service plan), DCFS noted that Aaron had successfully complied with the rules of the program since his placement in TLP; that he had established a relationship with other male peers; and that he was building positive relationships with TLP staff. The December 2011 service plan noted that, prior to Aaron's placement in TLP, he admitted to using marijuana and participated in drug treatment at Woodridge Interventions. The December 2011 service plan stated that it was agreed that Aaron would remain in the drug treatment program at Woodridge Interventions and that he would provide weekly urine samples. It further stated that Aaron earned a high school diploma in June 2011; that in November 2011, a ChildServ staff member accompanied Aaron to the College of DuPage to inquire about his academic status and financial aid; and that it was recommended to Aaron that he complete one of the classes in which he had enrolled, but that Aaron did not comply. Further, the December 2011 service plan stated that as of December 8, 2011, Aaron had obtained employment as a store sales associate.[2]

¶ 5       On February 29, 2012, less than three months before Aaron's nineteenth birthday, counsel and guardian *ad litem* (GAL) for Aaron filed a motion to extend wardship and guardianship (motion to extend) until the age of 21. The GAL argued that Aaron continued to require services from DCFS, such as substance abuse treatment, and educational and vocational services, which were essential to Aaron's transition into adulthood. On March 9, 2012, a hearing was held on the GAL's motion to extend, during which the supervisor of TLP, Deanna Jacek (Jacek) testified. Jacek testified that Aaron had been attending all but one of his classes; that Aaron was suspected of substance abuse; and that the agency would make another substance abuse assessment should there be no improvement. She testified that Aaron was respectful to TLP staff members, but that he liked having his girlfriend visit and "just kind of exist[ed] in the house." However, Aaron had been making telephone calls and working with a ChildServ vocational placement coordinator to look for a job. Although the

---

[1]Aaron eventually pled guilty to a lesser charge of aggravated battery and was sentenced to five years of probation.

[2]Aaron was terminated from employment shortly after he obtained this position.

agency had recommended individual counseling to Aaron, he did not think he needed it. Jacek testified that Aaron's allowances from ChildServ were significantly reduced as a result of his skipping classes. Jacek opined that Aaron's wardship should be extended beyond his nineteenth birthday, because he needed to gain the necessary skills of living independently, especially in the areas of budgeting and finance. On cross-examination, Jacek testified that Aaron kept in contact with his probation officer.

¶ 6        At the conclusion of the hearing, the circuit court granted the GAL's motion to extend for six months, stating that Aaron needed the assistance of the services being offered to him in order to achieve independence. The circuit court noted that Aaron needed to attend school and that his educational benefits could extend to age 23. Further, the circuit court found that Aaron let "weed" become a distraction, but that he could succeed if he took advantage of the State's help before he became emancipated. The circuit court then set a permanency hearing for August 14, 2012.

¶ 7        On August 14, 2012, at a permanency hearing, the circuit court heard testimony by Kimberly Smith (Smith), the case manager for Aaron, and admitted into evidence a ChildServ court report (ChildServ report) prepared by Smith and a copy of a June 2012 DCFS service plan (the June 2012 service plan). The June 2012 service plan stated that Aaron had violated TLP rules on multiple occasions by having an "uninvited female guest in his room"; that he was terminated from his employment as a store sales associate after a short period of time; and that he continued to make self-destructive decisions.

¶ 8        The ChildServ report stated that since March 2012, Aaron's compliance with TLP rules and procedures had declined; that he continued to use illegal substances and engage in underage drinking; that his achievement level was unsuccessful; and that he was deteriorating and making no advances to better himself. The ChildServ report noted that in May 2012, a juvenile warrant was issued for Aaron's arrest because he violated the terms of his probation, for which he was detained[3] by the police for 16 days. During his detention, Aaron completed a drug treatment assessment with an organization, Treatment Alternatives for Safe Communities (TASC), which recommended that he participate in an adult outpatient program. Aaron then attended an "intake" assessment on July 30, 2012, and was scheduled to begin treatment in mid-August 2012. The ChildServ report further stated that Aaron had recently missed two appointments with his probation officer; that he owed over $2,000 in school grants as a result of failing all of his classes at the College of DuPage; and that an outstanding debt he owed to Sprint telephone company had been reported to a collection agency. The ChildServ report stated that, despite Aaron's ongoing refusal and reluctance, he could benefit from some of the services offered.

¶ 9        Smith, the case manager for Aaron, testified to the contents of the ChildServ report. She testified that Aaron associated with the "wrong crowd"; that he continued to use drugs; that he needed to refrain from being a manipulative and negative person within the community; that he had chosen not to take full advantage of the services offered to him; and that he had

_____

[3]Although it is unclear in the record, it could reasonably be presumed that Aaron served time in juvenile detention.

not made progress in his behavior. On cross-examination, Smith opined that Aaron was unable to live independently at that time without the assistance of DCFS and ChildServ, particularly because he had no employment and possessed very poor judgment. She testified that Aaron had informed her that he wanted drug treatment help, but that TLP staff members had the general impression that Aaron was "just existing in the placement" with minimum progress.

¶ 10     Aaron testified that he had improved since he was released from detention, stating that he was doing "more stuff around the house" and was being more respectful. He recognized that he had done "a lot of negative stuff," and he did not blame ChildServ for his poor behavior.

¶ 11     The circuit court then responded that it had heard testimony of this nature "pretty consistently" since it had presided over Aaron's case, and it cautioned Aaron that one of three things would likely occur if he did not take advantage of the available services to achieve independence–homelessness, incarceration or premature death. The circuit court noted that it was trying to help Aaron avoid these three things, but that he was not listening and did not care. The circuit court then held that it would close Aaron's case, but that it would stay the order closing his case for 45 days–until September 27, 2012–in order for the court to reassess whether there might be some marked difference in Aaron's behavior during that period of time. The court then entered a form order stating that "Aaron [was] unable to live independently and [was] not cooperating and participating in services to help him achieve independence," and it checked boxes on the form indicating that "[g]ood cause [had] been shown to support extension of wardship beyond the minor's [nineteenth] birthday until further order of court," and that "[t]he health, safety, and best interests of the minor and the public require[d] the extension of wardship beyond the minor's [nineteenth] birthday until further order of court."

¶ 12     On September 27, 2012, a status hearing was held during which Smith testified that Aaron was in desperate need of the following types of services: educational; vocational; life skills; therapy; and substance abuse treatment. She testified that Aaron's progress had been nonexistent in those services. Although he had participated in another drug assessment at Woodridge Interventions as part of a court-mandated order for his delinquency issues, he had not attended the outpatient drug treatment program. Smith testified that Aaron had just informed her on the morning of the September 27, 2012 hearing that his reason for failing to attend a drug treatment appointment was due to illness. Aaron had also violated the terms of his probation, he had "declined a deal" and was now scheduled to have a court hearing on his delinquency issues, and he had also been ticketed for underage drinking. Aaron had also violated curfew on multiple occasions and had made no progress. On cross-examination, Smith testified that she had not been able to speak to any TLP staff members to confirm whether Aaron had in fact been sick on the day of his missed drug treatment appointment. She testified that, in the event that Aaron's case is kept open, she would help Aaron participate in the outpatient drug treatment program. Aaron had informed Smith that he was seeking employment and had provided her with the names of two specific TLP staff members on the morning of the hearing–Adretha Cane and Norman Bobo–who could allegedly verify that he had been actively seeking employment. However, Smith had not been able to confirm

the veracity of that statement with those TLP staff members.

¶ 13    The circuit court then asked Aaron whether he wished to make a statement. Aaron stated that he was "focused on the good" that he did, that he was making a little effort to find a job, and that TLP staff members had assisted him in filling out job applications. Aaron explained that he really wanted help from a drug treatment program, that he was sick on the day of a scheduled drug treatment appointment, and that he had called and left messages for "the lady" in the drug treatment program.

¶ 14    The circuit court then remarked that it could not confirm whether Aaron had in fact been sick on the day of the drug treatment appointment, but that his failure to attend drug treatment came in the context of his "consistently moseying along not doing anything while all these other people are furiously involved in trying to help [him]." The court noted that Aaron had been given "fair warning" and that it was going to close his case. At that time, the GAL asked the court for leave to further question Aaron, which the court granted. Upon further examination, Aaron testified that he would live with his sister, Tonette, if he could not continue to live at the facility provided by TLP. He admitted that he used marijuana about four times a week, but that he wanted the court to keep his case open because he really wanted to do better and participate in a drug treatment program. Aaron testified that smoking was "getting to be a habit," but that being in ChildServ's TLP was better than moving back to Chicago, where he would get "shot at." Aaron stated that he had no source of income other than what he received from ChildServ.

¶ 15    Following Aaron's testimony, the GAL argued that the Act provides that a minor's lack of cooperation could not be a court's sole reason for closing his child protection case, nor a court's basis for finding that the minor could function independently. The GAL asserted that, although Aaron had done very little since the last court hearing, it was clear that he could not function independently without a job or the ability to maintain his own housing, while also being addicted to drugs. The GAL then requested that the court keep Aaron's case open.

¶ 16    The circuit court then noted that its decision to close Aaron's case was not made lightly, that Aaron faced challenges ahead of him in terms of trying to live independently without a source of income. The court then stated that there was "very little efficacy in ChildServ's efforts with Aaron" and surmised that it was very likely that he would be in custody within the next few weeks. In closing the case, the court found that there was "very little legal basis" to keep the case open. The court then denied the GAL's oral request to stay the case closure. On that same day, September 27, 2012, the circuit court, *sua sponte*, entered a form order with two checked boxes indicating that "[i]t is in the best interest of the minor that this case be closed" and that "[w]ardship is terminated, guardianship is terminated, and the case is closed."

¶ 17    On September 28, 2012, a notice of appeal was filed by the public guardian, and this court granted the public guardian's emergency motion to stay the circuit court's order until October 29, 2012.

¶ 18    On October 26, 2012, the public guardian filed a motion to extend the stay of the circuit court's order beyond October 29, 2012, which this court granted and ordered that the stay be extended until resolution of this appeal.

¶ 20    We determine the following issues on appeal: (1) whether the circuit court failed to comply with section 2-31(2) of the Act when it terminated Aaron's wardship, discharged DCFS' guardianship of Aaron, and closed the case; and (2) whether the circuit court's ruling was against the manifest weight of the evidence presented.

¶ 21    As a preliminary matter, we note that, in a letter dated December 26, 2012, the State advised the clerk of this court under Local Rule 38 of the First District that it elected not to file a response brief in this case. See Ill. App. Ct., First Dist., R. 38 (July 1, 2008) ("[a]ny party who has filed an appearance but will not be submitting a brief shall send a letter to the Clerk of the Appellate Court on or before the date the party's brief would have been due advising that no brief will be filed by that party"). Although the State did not file a response brief, we may decide the merits of this appeal under the principles set forth in *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495 (1976) (where the record is simple and the claimed errors are such that the reviewing court can decide them without the aid of an appellee's brief, the court should address the merits of the appeal). See *United Transfer, Inc. v. Lorence*, 2011 IL App (2d) 110041, ¶ 1.

¶ 22    Turning to the merits of the appeal, we first determine whether the circuit court failed to comply with section 2-31(2) of the Act when it terminated Aaron's wardship, discharged DCFS' guardianship of Aaron, and closed the case. See 705 ILCS 405/2-31(2) (West 2010). We review this issue *de novo*. See *In re Vicente G.*, 408 Ill. App. 3d 678, 682, 946 N.E.2d 437, 440 (2011).

¶ 23    The public guardian argues that the circuit court failed to observe the requirements of the Act when it closed his case and terminated his wardship and guardianship, without considering or making specific findings concerning his best interest, wishes or ability to maintain his independence.

¶ 24    Section 2-31 of the Act provides in relevant part the following:

"(1) All proceedings under this Act in respect of any minor *** automatically terminate upon his attaining the age of 19 years, except that a court may continue the wardship of a minor until age 21 for good cause when there is satisfactory evidence presented to the court and the court makes written factual findings that the health, safety, and best interest of the minor and the public require the continuation of the wardship.

(2) Whenever the court determines, *and makes written factual findings*, that health, safety, and the best interests of the minor and the public no longer require the wardship of the court, the court shall order the wardship terminated and all proceedings under this Act respecting that minor finally closed and discharged. *** When terminating wardship under this Section, if the minor is over 18, *** the court *shall also make specific findings of fact* as to the minor's wishes regarding case closure and the manner in which the minor will maintain independence. *The minor's lack of cooperation with services provided by the [DCFS] shall not by itself be considered sufficient evidence that the minor is prepared to live independently and that it is in the best interest of the minor to terminate wardship*." (Emphases added.) 705 ILCS 405/2-31(1), (2) (West 2010).

A "minor" is defined under the Act as a person under the age of 21. 705 ILCS 405/1-3 (West

2010).

¶ 25 In *In re Vicente G.*, the circuit court closed the cases of three siblings under the guardianship of DCFS and the wardship of the court, on the basis that the mother had abducted them and DCFS had been unable to locate them for three years. *In re Vicente G.*, 408 Ill. App. 3d at 679-82, 946 N.E.2d at 438-40. In terminating wardship and guardianship, the court stated that it could not fulfill its duties and responsibilities because the mother and the children could not be located and that there was no reason to believe they would be located in the near future. *Id.* at 681, 946 N.E.2d at 439-40. On appeal, the reviewing court held that the circuit court, in terminating wardship and guardianship and in closing the minors' cases, had failed to consider the minors' best interest or make written findings in compliance with section 2-31(2) of the Act. *Id.* at 683-84, 946 N.E.2d at 441. Accordingly, the reviewing court held that the circuit court's order discharging the case was ineffective. *Id.* at 684, 946 N.E.2d at 441.

¶ 26 We find *In re Vicente G.* to be instructive. In the case at bar, following the September 27, 2012 hearing, the circuit court entered a written form order with two checked boxes indicating that "[i]t is in the best interest of the minor that this case be closed," and that "[w]ardship is terminated, guardianship is terminated, and the case is closed." We find that the written form order neither contained any written factual findings regarding the health or safety of Aaron, nor did it contain any written findings relating to the health, safety and best interest of the public, as required by section 2-31(2) of the Act. Our review of the September 27, 2012 transcripts of the proceedings shows that, although the circuit court found "very little efficacy in ChildServ's efforts with Aaron," it did not explain how it was in Aaron's best interest to close the case and terminate his wardship and guardianship. Further, the record shows undisputed testimony from Aaron that he wished the court to keep the case open so he could improve and participate in a drug treatment program, and that he would live with his sister, Tonette, should he no longer be allowed to live at the TLP facility. However, the circuit court made no express specific findings of fact, as required by the provisions of the Act, as to Aaron's wishes regarding case closure or the manner in which he would be able to live independently. Rather, the circuit court addressed Aaron's long-standing issue of not taking full advantage of the services that were being offered to him and acknowledged the challenges that he would face in living independently without a source of income. Thus, because the circuit court failed to comply with the requirements of section 2-31(2) of the Act, we hold that the circuit court's September 27, 2012 order terminating wardship and guardianship and discharging the case was ineffective.

¶ 27 We find that, in addition to the court's failure to observe the requirements of the Act, the evidence presented at the September 27, 2012 hearing did not support the circuit court's decision to close Aaron's case and terminate his wardship and guardianship. See generally *In re Aaron R.*, 387 Ill. App. 3d 1130, 902 N.E.2d 171 (2009) (reviewing the sufficiency of the evidence to support a termination of wardship and guardianship even after determining that the circuit court had been noncompliant with the requirements of section 2-31(2) of the Act).

¶ 28 A court's decision to terminate wardship and close a ward's case is reviewed under a manifest weight of the evidence standard when the court's weighing of facts is at issue. *Id.*

at 1141, 902 N.E.2d at 179. A court's ruling is against the manifest weight of the evidence if "it is unreasonable, arbitrary and not based on the evidence, or when the opposite conclusion is clearly evident from the record." (Internal quotation marks omitted.) *In re Guardianship Estate of Tatyanna T.*, 2012 IL App (1st) 112957, ¶ 19.

¶ 29   Our review of the record shows that on February 29, 2012, prior to Aaron's nineteenth birthday, the GAL filed a motion to extend wardship and guardianship for Aaron until the age of 21. On March 9, 2012, a hearing was held on the motion to extend, during which Jacek, the supervisor of TLP, testified to Aaron's progress, his suspected substance abuse problems, his job search, and his need to gain the necessary skills to achieve the goal of independence. Following the March 9, 2012 hearing, the circuit court granted the GAL's motion to extend for six months, stating that Aaron needed the assistance and services being offered to him in order to achieve independence. On August 14, 2012, at a permanency hearing, evidence was presented to the court that Aaron's compliance with TLP rules and procedures had declined, that he continued to use illegal substances and engage in underage drinking, that he had been arrested and detained for 16 days, and that he made no progress in his behavior nor did he take advantage of the services that were available to him. At the conclusion of the August 14, 2012 hearing, the circuit court held that it would close Aaron's case, but that it would stay the order closing his case for 45 days. However, in its order dated August 14, 2012, the circuit court made a specific written finding that "Aaron [was] unable to live independently and [was] not cooperating and participating in services to help him achieve independence," and checked boxes on the form order indicating that good cause had been shown–specifically, that it was in the health, safety and best interest of Aaron–to extend wardship beyond Aaron's nineteenth birthday until further order of the court. On September 27, 2012, at a status hearing, Smith testified that Aaron was in desperate need of various types of services, that his progress was nonexistent in those services, that he had violated the terms of his probation, and that he had failed to participate in drug treatment. Aaron testified that he wanted to participate in drug treatment for his substance abuse problem, that he was making some effort to find a job, that he wanted the court to keep his case open, and that he would live with his sister, Tonette, if he were unable to live at the TLP facility. The circuit court then found that there was "very little efficacy in ChildServ's efforts with Aaron" and concluded that it was in his best interest to close the case and terminate wardship and guardianship.

¶ 30   We have examined the same evidence presented before the circuit court at the September 27, 2012 hearing and find that the manifest weight of the evidence did not support the conclusion reached by the circuit court. The evidence was clear that Aaron lacked employment, needed drug treatment, and had delinquency issues at the time of his case closure. It is also undisputed that Aaron wished the court to keep his case open so that he could seek treatment for his substance abuse problems. While Aaron noted that he could live with his sister, Tonette, in the event that he was not allowed to stay in TLP, there was no evidence to suggest that he was prepared to live independently where he had no income to reasonably allow him to do so. Our review of the circuit court's remarks at the September 27, 2012 hearing reveals that it gave no consideration to Aaron's need for the services made available to him, particularly drug treatment, nor did the court give consideration to how

Aaron would successfully reach independence without further aid from DCFS. In fact, to the contrary, the circuit court acknowledged that Aaron faced challenges ahead of him in terms of trying to live independently without a source of income. Thus, we find that the evidence amply supported that it was in the best interest of Aaron to continue wardship and guardianship, and the circuit court's decision to terminate wardship and guardianship and to close the case was against the manifest weight of the evidence. See *In re Shawn B.*, 218 Ill. App. 3d 374, 382, 578 N.E.2d 269, 274-75 (1991) (termination of guardianship without ensuring that ward was prepared to become a useful and independent member of society failed to satisfy statutory obligation to act in best interest of child).

¶ 31 Further, although we understand the circuit court's frustration with Aaron's lackluster participation and motivation to engage in the services provided to him, we find that under the plain language of the Act, Aaron's lack of cooperation and failure to avail himself of the services could not by itself provide a sufficient basis to terminate his guardianship. Further, the evidence does not support the conclusion that he is prepared to live independently or that it was in his best interest to terminate wardship. See 705 ILCS 405/2-31(2) (West 2010). Accordingly, we hold that under the facts of this case and the applicable statute, the circuit court abused its discretion in closing the case and terminating wardship and guardianship.

¶ 32 For the foregoing reasons, we reverse the circuit court's September 27, 2012 order and remand the matter to the circuit court with instructions to enter an order extending Aaron's wardship and guardianship. Both shall remain in place up to his twenty-first birthday as allowed by statute or at such time prior to his twenty-first birthday that the evidence shows that he is able to live independently.

¶ 33 Reversed and remanded.